## 39464. CHAMBERS v. THE STATE.

HILL, Chief Justice.

Jimmy Lewis Chambers, Jr., was tried and convicted of murder and kidnapping in Fulton County. Although a death sentence was sought, the jury recommended mercy and a life sentence was imposed for the murder, with a ten-year consecutive sentence imposed for kidnapping. Chambers appeals.

Because there is no challenge to the sufficiency of the evidence, we set out here a summary of the facts. On the evening of December 1, 1982, the victim, Angela Pitts Fuller, arranged with a friend, Yvonne Mitchell, to take her to retrieve her car from a friend who had borrowed it. Yvonne borrowed a 1978 Cadillac, picked up the victim, and the two women subsequently visited the victim's boyfriend at his place of work, where the boyfriend gave something to the victim; then they stopped by the apartment of a man named Gerald. The victim went in for about 15 minutes while Yvonne waited in the car.

The victim then called co-indictee Ronnie Redmond to see if they could come over to his apartment. They arrived about 10:30 p.m., and a woman who had been there left. After co-indictee Benny Green arrived and while Benny Green, Yvonne, and the victim watched television, Redmond called the defendant on the phone. The defendant arrived at about midnight with a machine gun slung over his shoulder and carrying what looked like a magnum handgun. At this point there was some talk about the victim having told Yvonne that while she, the victim, had been in the hospital for a recent operation some police officers had indicated to her that Redmond, whom the victim knew, and the defendant, whom she did not know,

were being watched by the police. The victim was then accused of being a "snitch" and the defendant and Redmond tied her up, using her belt, a lamp cord and a coat hanger. Green then helped them put the victim, wrapped in a sheet, in the trunk of Yvonne's borrowed Cadillac, and Redmond and the defendant drove off in the car. The defendant had his "magnum" and Redmond a .38 he had obtained from a closet.

The victim's body was recovered from Camp Creek a few days later. She had been shot in the abdomen from a few feet away, and also had sustained a fatal contact wound to her head. Both shots were from a .38 pistol, later shown to be Redmond's. The victim was dressed in a red T-shirt and tight blue jeans; a 6" to 8" twig or stick was found inside her jeans. Her arms were still bound tightly behind her back with her blue belt and a coat hanger as when she was taken from the apartment, but her legs had apparently been untied and retied with first the sheet and then the lamp cord over the sheet, rather than with only the lamp cord as when she was abducted. Sperm were found in her vagina (which the expert said could have been present for up to 3 days before she died) and in her mouth (which, due to saliva action, the expert testified generally were not likely to remain in the mouth for more than 60 minutes).[1]

The defendant was arrested on December 8, 1981, at which time he denied any knowledge of the murder. He later made two statements, which were reduced to writing. Both times he insisted that he had been forced by Redmond to participate, that he begged Redmond not to shoot the victim and had run away before he heard the two shots fired, that Redmond had then followed him in the car, and that he was forced to return to help dump the body into Camp Creek.

Redmond also made a statement which was brought out on cross-examination of the police officer who took the statement, saying that he had participated under duress, that the defendant had taken his gun from him, and that he was told to drive away and return. When he came back, the victim was dead and he helped throw her body off the bridge.

Blood spatters of a type matching that of the victim found on the defendant's left shoe indicate that his foot was near the victim's head when she was shot.

Both men then returned to Redmond's apartment at about 2:00 a.m., where Redmond told Yvonne that the victim "was through." She left in the Cadillac. The three men went to a nearby bar, where

---

[1] The expert testified that it is rare to find a positive oral swab.

they threw a brown bag containing the victim's coat, purse and shoes into a dumpster.

A patron at the bar thought Green had perpetrated a recent bank robbery and called the police. The three were questioned at that time; Green was arrested when drugs were found in his car; Redmond was taken into custody on a parole violation; and the defendant was released, but a nine millimeter gun, about the size of a magnum, was seen in his car. Later, two pairs of bloodstained gloves were taken from his car in a search under a warrant.

A special jury found the defendant competent to stand trial even though a psychologist testified that the defendant had a low IQ for which he overcompensated and that there was some evidence of brain damage. A psychiatrist found him capable of understanding the proceedings and consequences of the charges against him.

After finding the defendant guilty of murder and kidnapping, the jury retired to consider imposing the death sentence under the aggravating circumstances that the murder occurred while in the commission of rape, and that the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." OCGA § 17-10-30 (b) (2), (b) (7) (Code Ann. § 27-2534.1). The jury recommended mercy without finding any aggravating circumstances, and a life sentence was imposed. The defendant appeals.

1. In enumeration 8, the defendant argues that the trial court abused its discretion in refusing a one-day continuance of the specially set jury trial in order for him to undergo a brain scan at his expense. Trial was set for June 21, 1982, to be preceded by a jury trial on defendant's special plea of insanity filed on or before June 3. In early May, defendant had been taken to Grady Hospital where he suffered from a diabetic coma for several days. He was then evaluated by a court appointed psychiatrist who found him competent to stand trial. A psychologist also subjected him to extensive tests, finding that he had a low IQ, and discovered that a brain scan in 1977 had revealed evidence of some brain damage. At trial the defendant sought the continuance in order to have another brain scan at his own expense. The defendant offered no reason why he could not have arranged for the brain scan before the specially set trial date. We find no abuse of discretion by the trial court in refusing to grant a continuance. *Leggett v. State,* 244 Ga. 226 (1) (259 SE2d 476) (1979).

In enumeration of error 9, the defendant argues that the verdict form sent out with the jury during the defendant's competency trial was prejudicial because it was captioned with the criminal case number and the charges for which the defendant had been indicted. The jury was informed during the proceedings of the charges pending

against the defendant and was clearly charged on its duty on the special plea of insanity. *Brown v. State*, 215 Ga. 784, 787 (113 SE2d 618) (1960). We do not find that the issue of competency was confused with the question of guilt or innocence, by the evidence presented, the charge, or the verdict form. *Crawford v. State*, 240 Ga. 321, 326 (240 SE2d 824) (1977), relied on by the defendant, is inapplicable here. We find no error.

2. Enumerations of error 1, 2 and 6 center around the evidence admitted concerning rape and sodomy of the victim before her death. In enumeration of error 1, the defendant urges prejudicial error by the state in introducing evidence of sexual misconduct when the defendant was charged only with murder and kidnapping. He claims the only purpose of this evidence was to inflame the jury since it was not relevant to the crimes charged.[2]

It is clear that the district attorney need not charge and convict on every crime committed during a criminal transaction. The defendant here seeks to take advantage of the district attorney's decision not to seek convictions for rape and sodomy.[3] The state is entitled to inform the jury of all the circumstances surrounding the commission of the crime or crimes charged and we find no error in admitting this evidence as part of the res gestae even though it may have incidentally placed the defendant's character in evidence. *Davis v. State*, 230 Ga. 902 (4) (199 SE2d 779) (1973).

In enumeration 2, the defendant argues that the state unconstitutionally shifted the burden of proof to him to refute the evidence of sexual assault to the victim by implying that the defendant could have taken a blood and saliva test to show he was not a member of the group which could have been the source of the samples taken from the victim. He contends that this implication also violated his right to remain silent.[4]

---

[2] Rape was one of the aggravating circumstances charged to the jury during the sentencing phase. It is clear that where the death penalty is sought on the (b) (2) ground "in the commission of another capital offense," here rape, it is not essential that the defendant have been charged with the other capital offense. *Amadeo v. State*, 243 Ga. 627, 631 (255 SE2d 718) (1979).

[3] The presence of sperm in the vagina and mouth of the victim along with the stick found in her tight jeans and the facts that her legs, but appparently not her arms, had been untied and retied are some evidence that rape and sodomy had occurred during the last hour of her life. The fact that there was no physical evidence of force used against the bound victim and that the victim had had an opportunity to have had sex with "Gerald" while in his apartment for 15 minutes several hours earlier merely made this issue a question of fact for the jury.

[4] The state, with probable cause, may take a blood sample from a defendant without consent to determine its alcohol content, without violating the defendant's

The state crime lab expert testified that it was possible in 80 percent of the population, called secretors, to find the protein substance which characterizes different blood types in the other fluids of the body such as the saliva or seminal fluid. In this 80 percent of the population then, the other body fluids can be typed in the same way blood is typed. The implication was that the defendant, by having his blood and saliva typed, could have shown that he was not in the same protein group as the person whose sperm were found in the victim. No objection to this testimony was made (and a vigorous cross-examination of the expert was conducted by the defense). Thus, the defendant has waived his right to raise this issue on appeal because no objection was made at the trial. *DeBerry v. State,* 241 Ga. 204 (1) (243 SE2d 864) (1978); *Salem v. State,* 228 Ga. 186 (3) (184 SE2d 650) (1971).

In enumeration 6, the defendant attempts to raise a Brady (v. Maryland, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963)) error as to the evidence presented at trial on direct examination by Yvonne Mitchell that the victim told her that she and her boyfriend had engaged in sexual intercourse about a week before her murder. He claims this was favorable evidence known to the prosecution which was not revealed until the trial. During a motion to suppress hearing on the vaginal and oral swabs, the state had relied on the recent vaginal surgery of the victim to support the idea that recent consensual sex was improbable; then, at trial, the state presented the contradictory statement of Yvonne Mitchell. The defense neither objected nor requested a mistrial during the trial nor renewed the motion to suppress.

The defendant has not shown in any way how this information would have affected the trial court's ruling on his motion to suppress, or how his defense was prejudiced so that he was denied a fair trial. On the contrary, this favorable evidence was in fact presented at trial for the jury to consider on the rape and sodomy question. Brady itself is not violated when Brady material is withheld from the defendant prior to trial and introduced by the state at trial. *Castell v. State,* 250 Ga. 776 (2b) (301 SE2d 234) (1983); see also *Gilreath v. State,* 247 Ga. 814 (7) (279 SE2d 650) (1981). We find no error here.

3. We find no reversible error in Officer Graham's reading of the police report prepared by Officer Coleman from Coleman's notes of

---

right against self-incrimination. Schmerber v. California, 384 U. S. 757 (86 SC 1826, 16 LE2d 908) (1966). Also, the defendant's refusal to take a blood-alcohol test may be used as evidence of guilt. South Dakota v. Neville, ——U. S.—— (103 SC 916, 74 LE2d 748) (1983).

the defendant's December 9, 1981, statement. Both officers were present when defendant's statement was given. No objection on this ground was made by the defendant at the time the report was read and the defendant himself requested that the statement be admitted in evidence. Compare *Freeman v. State,* 230 Ga. 85 (2) (195 SE2d 416) (1973). Enumeration of error 3 is without merit.

4. The testimony elicited by the state that the defendant was under investigation by the IRS in regard to his business dealings was relevant as to the motive in killing the victim for being a "snitch." That the defendant's character was incidentally put in issue by this evidence is not ground for reversal. Thus, enumeration of error 4 has no merit.

5. In enumerations 5 and 7, the defendant urges error in the admission of a .38 caliber pistol (error 7), seized in the search of his home, and of an AR-16 gun clip (error 5), taken while searching his truck which was not involved in the crime. He claims that these items were not relevant to the crime on trial and thus impermissibly placed his character in evidence. While the gun clip and the defendant's .38 were not relevant, their admission was harmless in light of the admissible evidence presented. Therefore, these enumerations present no grounds for reversal.

6. In enumeration 10, the defendant contends the jury was prejudiced against him by seeing headlines to the effect that John Hinckley was not remorseful for his attempted assassination of President Reagan. The jury was polled, without reference to the content of the article, to determine whether any of them had been prejudiced against the defendant by reading this headline. While two jurors and one alternate had seen the newspaper in a box outside the lunchroom in the courthouse, they all stated that the headline had no prejudicial effect on them. The court proceeded with the trial after questioning the jurors with no objection or request for a mistrial by the defendant. We find no error. See *State v. Griffin,* 240 Ga. 470 (241 SE2d 230) (1978).

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 19, 1983.

*Philip Louis Ruppert,* for appellant.

*Lewis R. Slaton, District Attorney, Russell J. Parker, Assistant District Attorney, Michael J. Bowers, Attorney General, Mary Beth Westmoreland, Assistant Attorney General,* for appellee.