## 42697. DAVIS v. THE STATE.
(340 SE2d 869)

HILL, Chief Justice.

This is a death penalty case. John Michael Davis was indicted for the murder and armed robbery of Susan Marlene Isham, and for theft by bringing stolen property into the State of Georgia. He entered a plea of guilty to the theft charge and proceeded to trial on the other two charges. He was found guilty by a jury of both, and the jury recommended that the death penalty be imposed for the murder. He was sentenced to death for the murder, twenty years for the armed robbery, and ten years for the theft. This is his appeal.[1]

Two confessions made by Davis comprised a substantial part of the state's evidence. The second of these contained numerous credible details. Davis recounted that in December 1983, he and his girl friend, Patricia Underwood, stole a Cadillac in Philadelphia. They soon realized that the stolen car belonged to a drug dealer named Sambucca and decided to leave the area. They kept Sambucca's identification cards, stole a Datsun 280Z, and drove to Georgia where they spent Christmas. On December 30, 1983, they checked into a motel in Columbus. That evening they went to a bar across the street and talked with a member of a band playing there.[2] Later that night, Davis wrecked the Datsun, left it at a convenience store, and secured a ride to the motel.

After noon the next day, December 31, Davis went back to the bar. The man he had met the evening before, who was then tending the bar, introduced Davis to a woman. The woman wanted to buy drugs, Davis agreed to sell her some, and they went back to the motel together. Underwood was in the room. The girl took a seat near the bathroom. Davis went into the bathroom to relieve himself; while there he picked up a curling iron and ripped the cord off. He came out of the bathroom behind the victim, wrapped the cord around her neck, knocked her to the floor and put his knee in her back. Then he dragged her into the bathroom. He and Underwood took the money from her purse and some of her jewelry. In one of the confessions he

---

[1] The crimes were committed on December 31, 1983. Davis was indicted on January 31, 1984; he was convicted and sentenced to death on June 8, 1985. The date for delivery of the transcript was extended to August 8, 1985, and the notice of appeal was filed on September 6, 1985. The appeal was docketed on September 20, 1985, and the case was orally argued on November 12, 1985.

[2] One of the confessions identifies the man as "Gary."

said that as they left the motel room, the victim was lying on the bathroom floor gulping. They fled in the victim's Mercury and proceeded to Philadelphia and then New Jersey.

Davis took the stand at trial and testified that he had confessed to the murder to protect Underwood. He admitted bringing the victim back to the room but said that he left the victim and Underwood alone there for about 15 minutes while he went to the office to reserve the room until Monday (January 2, 1984), and when he returned the victim was on the floor, Underwood was on top of her, and the victim was dead.

The operator of the motel, Harold Kite, testified that the defendant, accompanied by a woman, registered on December 30, 1983, under the name of Sambucca. The next day the woman came in shortly after noon, identified herself as Patricia Sambucca, and paid for another night. Kite's son, Thomas, testified that he was at the desk from around noon until 7 or 8 in the evening of the 31st. He was there with his father when a woman came in and paid for that night. About 2:30 or 3, when he was alone in the office, he saw the defendant and a woman drive up in a light colored Mercury Grand Marquis. He then saw the two of them in conversation with the woman he thought was the defendant's wife. In a few minutes the defendant came in, picked up a key to his room, and left. Five or ten minutes later he came back, appeared nervous, and paid for an additional night (apparently in an effort to delay discovery of the body). Ten or fifteen minutes later Kite saw the defendant and the woman he knew as Patricia Sambucca leave in the Mercury. A maid discovered the victim the next day, January 1, 1984.

Gary Lofton testified that he had been a friend of the victim for several years, and that in December of 1983 he was working at the Peachtree Pub in Columbus. He also played in a band that sometimes played at the pub. He testified that he met the defendant on December 30, 1983, at the pub. Earlier that day he had spoken to him briefly as both left their rooms at the motel; the defendant and his wife had asked what was happening across the street, apparently meaning the pub. At the pub, the defendant introduced himself as Jack and said he was from Philadelphia and was staying at the motel. He introduced the woman with him as his wife, Pat, and said she was an exotic dancer. Around noon or 1 p.m. the next day the victim stopped by the pub. The defendant was sitting at the bar when she arrived, and she sat by him. After a while Pat came in, spoke to the defendant briefly, and then sat on the other side of the bar. The defendant and the victim sat and talked for about an hour. Then the victim told him that she was on her way to Atlanta, but she was going to stop by the motel with the defendant for about five minutes before she left. The defendant and the victim then left the bar, exiting by the back door.

At that time, Lofton had to go in the back for a case of beer. When he returned with it, he noticed that the defendant's wife was no longer at the bar. He did not know exactly when she had left.

The next day, he received a call at the pub telling him that the victim had not shown up in Atlanta. He then noticed that an ambulance and some police cars were at the motel. He went across the street and was told a young woman had been murdered. When he volunteered that he might be able to identify her, he was shown the body. It was that of Susan Marlene Isham.

Warren Tillman, a medical examiner with the state, testified that he examined the body of Susan Marlene Isham on January 2, 1984; that she was 65 inches tall and weighed 175 pounds; that she died from asphyxiation caused by strangulation; and that pressure would have had to be applied for three to four minutes in order to cause her death. Davis raises 29 enumerations of error. Of these, six relate to voir dire, and will be considered first.

## Voir Dire

1. Davis was tried, as is customary in capital cases in Georgia, by a jury which was qualified under *Witherspoon v. Illinois*, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968), prior to commencement of the guilt-innocence phase of his trial. He contends on appeal that this produced a jury so conviction prone that it was not a representative cross-section, and therefore his conviction must be reversed. He relies on *Grigsby v. Mabry*, 758 F2d 226 (8th Cir. 1985), cert. granted sub nom. *Lockhart v. McCree*, ___ U. S. ___ (106 SC 59, 88 LE2d 48) (1985).

We find that Davis failed to challenge the *Witherspoon* voir dire at trial. Having raised no objection below, he may not now assert error on this ground. *Hance v. State*, 254 Ga. 575, 576 n. 2 (332 SE2d 287), cert. denied, 106 SC 606, 88 LE2d 584 (1985). We note, however, that we have previously expressed our disagreement with *Grigsby v. Mabry*, supra, which is not binding on this court. *Ford v. State*, 255 Ga. 81 (7) (335 SE2d 567) (1985); accord *Hance v. State*, supra; *Mincey v. State*, 251 Ga. 255 (2) (304 SE2d 882), cert. denied, 104 SC 414, 78 LE2d 352 (1983).

2. Davis also complains that the trial court erred in failing to strike for cause a juror, Horne, who expressed a bias in favor of the death penalty. The juror was extensively questioned by the prosecutor, the defendant and the court in an effort to clarify her position. Having reviewed the transcript, we conclude that the trial court did not err in overruling the defendant's motion that she be stricken from the jury. *Hance v. State*, 245 Ga. 856 (6) (268 SE2d 339), cert. denied, 449 U. S. 1067 (1980); *Spivey v. State*, 253 Ga. 187, 194-96 (319 SE2d

420) (1984), cert. denied, 105 SC 816, 83 LE2d 809 (1985).

In his brief, defendant makes reference to "several venirepersons [who] indicated . . . clear bias in favor of the death penalty and against Mr. Davis" who were not excused. His only objection at trial was to Horne, and the others referred to in the brief are not identified. The trial court did not err by not excusing any jurors on its own motion. *Spivey v. State*, supra, 253 Ga. at 194.

3. The defendant complains that the trial court erred by not excusing for cause three jurors employed by law enforcement agencies. The three he complains of are McClendon and Tillman, correctional officers at an institution referred to as "Jack Rutledge" or as "Jack T.," and Richardson, a former police officer then working for the state at Metro Correctional Institution. The defendant did not object to any of the three at trial, and he may not raise this issue for the first time on appeal. *Miller v. State*, 139 Ga. 716 (2) (78 SE 181) (1913). We note, however, that *Hutcheson v. State*, 246 Ga. 13 (268 SE2d 643) (1980), on which he relies, is not controlling. See *Jordan v. State*, 247 Ga. 328 (6) (276 SE2d 224) (1981); *Wilson v. State*, 250 Ga. 630 (4a) (300 SE2d 640), cert. denied, 464 U. S. 865 (1983).

4. Defendant's contention that the trial court impermissibly restricted the scope of voir dire is simply not borne out by the record. Nor is his contention that jurors Brown and Hudson were erroneously excused in violation of *Witherspoon v. Illinois*, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968). *Wainwright v. Witt*, 469 U. S. __ (105 SC 844, 83 LE2d 841) (1985); *Alderman v. State*, 254 Ga. 206 (4) (327 SE2d 168), cert. denied, 106 SC 282, 88 LE2d 245 (1985).

5. During the voir dire, a juror who had previously qualified for the panel asked to be excused due to illness. She explained that she had a problem with ulcers, and that she had been feeling ill after her individual voir dire the previous morning and had been nauseated all night. When the defendant's attorney asked, "And all that started after we talked with you yesterday morning," she responded, "No. I have [had] the problem for a long time but just yesterday it started up again. And I just get so sick and I get dizzy." She said she had been treated at Martin Army Hospital. The trial court observed, "Let the record show that she appears to be sick to me and appears to be in pain. . . . It doesn't appear she can go on." He then asked counsel's opinion, and the defendant's attorney said he felt her discomfort was due to having been called as a juror and he would not agree to excuse her. The trial court responded, "She appears to me to be terribly sick, so for that reason, Ms. English, I'm going to excuse you for cause." We hold that the trial court did not abuse its discretion in excusing this juror. See *Patterson v. State*, 239 Ga. 409 (1) (238 SE2d 2) (1977).

*Patricia Underwood*

Several of the defendant's enumerations of error complain of rulings regarding the participation of Patricia Underwood in the trial. In order to address these, it is necessary to set out the facts as they developed as the trial progressed.

Prior to trial, the state moved to exclude any hearsay evidence of a confession by Underwood. According to the state's motion, Underwood had confessed to the defendant's attorney that she had committed the murder. Although the trial court stated, "I don't believe that would be admissible unless you planned or unless you were to assure the court, that you planned to call her," a ruling on the motion was postponed until such time as the evidence in question might be offered.

Also prior to trial defense counsel stated for the record that it was his understanding that no agreement or deal had been made with Underwood, and asked if that was correct. The prosecutor responded that he did not feel he would have to disclose any agreement or deal unless he called her as a witness and he did not plan to, but that he was not aware of any promises having been made to her.

Later, during presentation of the state's case, a detective from Philadelphia testified that the defendant had been arrested in New Jersey on January 11, 1984, and that he had gone to question him on January 12. At that time, the defendant made one of the two confessions which was admitted at trial. The detective testified that he had met Underwood at that time. At the close of cross-examination, the DA said: "Could we ask Detective Sergeant Rosenstein to see if, to identify Patty Underwood? She's outside and we'd just like to have her brought in and identified. I don't believe there is any objection, is there?" There was no objection, and she was brought into the courtroom and identified by Sergeant Rosenstein. The defendant then asked that she be held in the courthouse so that he could cross-examine her. The court noted that she had not testified, but ordered her held downstairs.

After the state closed, the defendant's attorney made his opening argument in which he stated that he expected the evidence to show that Patty Underwood had murdered the victim while the defendant was out of the room. When he finished, the trial judge said, "All right. Call your first witness." The DA interjected, "Your Honor, excuse me. We've got a matter outside the presence of the jury." Defense counsel then said: "Your Honor, we wanted to call Patty Underwood." The DA interjected, "Your Honor," and defense counsel interrupted to say, "He wants us to call her out of the presence of the jury."

At that point, the trial judge sent the jury out. Underwood's attorney explained that she would not answer any questions that would

incriminate her and asked if he could stand beside her to facilitate conferring with her. She took the stand and refused on the basis of the Fifth Amendment to answer a series of questions, beginning with whether she knew the defendant. Finally the court asked if she would answer any question concerning any relationship with the defendant in Columbus, or with the victim. She answered, "No." The court then ruled that the defendant could not call her as a witness because she would not answer any questions but would claim her Fifth Amendment rights. The court then asked the state if they wanted him to instruct the jury to disregard defense counsel's earlier statement that he was going to call Underwood. The state declined, but asked that defense counsel be told not to mention it again.

Defendant now contends that it was error to refuse "to disclose the agreement between the state and the co-defendant," and that his right to due process was denied when the state brought Underwood into the courtroom, knowing that she would invoke the Fifth Amendment. He also contends that his right to confront witnesses against him was denied when he was not allowed to cross-examine her in the jury's presence, and that his rights under the 6th, 8th and 14th amendments were denied by the ruling excluding evidence of Underwood's confession.

6. Although defendant complains of the failure to disclose "the agreement between the state and the co-defendant," the transcript belies the existence of any such agreement. If there were such an agreement, it would have become material only when Underwood took the stand because the value of such an agreement to the defendant lies in its tendency to impeach the state's witness. *Giglio v. United States*, 405 U. S. 150 (92 SC 763, 31 LE2d 104) (1972); *Owens v. State*, 251 Ga. 313, 316-17 (305 SE2d 102) (1983).

7. The defendant contends that it was error to allow the state to bring Underwood into the courtroom to be identified. The defendant, however, did not object to her being brought in even though he was asked if he had an objection. Therefore, any error was expressly waived. We note, however, that in our opinion there was no error. We reach this conclusion notwithstanding the fact that the prosecutor conceded in oral argument that he wanted the jury to see Underwood because he felt she was too small to have murdered the victim herself. Underwood's size was part of the state's case. The trial court did not err in letting the jury see her.

The defendant goes on to contend that once Underwood was identified, he had a right to cross-examine her. We decline to decide whether her identification by the detective rendered her a "witness against him" within the meaning of the Sixth Amendment which triggered his right to cross-examine her because, in this case, any such right was defeated by her determination to assert the Fifth Amend-

604

ment and refuse to answer any relevant questions. Numerous federal courts have concluded that: "If it appears that a witness intends to claim the privilege as to essentially all questions, the court may, in its discretion, refuse to allow him to take the stand. Neither side has the right to benefit from any inferences the jury may draw simply from the witness' assertion of the privilege either alone or in conjunction with questions that have been put to him." *United States v. Lacouture*, 495 F2d 1237, 1240 (5th Cir.), cert. denied, 419 U. S. 1053 (1974), quoting *United States v. Johnson*, 488 F2d 1206, 1211 (1st Cir. 1973). As the *Lacouture* court explained, one reason for this rule is that reliable inferences do not ordinarily follow from a witness' invocation of the Fifth Amendment.

That is especially true here. Underwood would be culpable under either version of the facts — i.e., under the defendant's repudiated confession, she is at least a party to murder and armed robbery. OCGA § 16-2-20. Under his testimony, she is the perpetrator of the murder. Her refusal to testify does not tend to establish which is true. Furthermore, it is extremely unlikely that the defendant was harmed by not being allowed to force her to invoke the Fifth Amendment in the jury's presence, since the jury would not reasonably expect Underwood to confess to the actual murder, so it would not question the defendant's failure to call her. We find no reversible error here.

8. Finally, the defendant contends that the trial court erred in excluding evidence of Underwood's alleged confession. While the defendant did try to put Underwood herself on the stand, the alleged confession was mentioned only once, when during direct examination the defendant said: "Patty stepped forward and confessed to this crime about three months ago which they won't allow the confession." The district attorney's hearsay objection was sustained. No offer of proof was made.

The trial court's ruling was correct because such a confession would fall squarely within Georgia's hearsay rule, OCGA §§ 24-3-1; 24-3-52, and because Underwood herself did not testify, it is not admissible pursuant to any exception heretofore recognized in Georgia. *Little v. Stynchcombe*, 227 Ga. 311 (2) (180 SE2d 541) (1971). OCGA § 24-3-52, supra, provides that "The confession of one joint offender or conspirator made after the enterprise is ended shall be admissible only against himself."

Nor in this case is the alleged confession admissible under the rationale of *Green v. Georgia*, 442 U. S. 95 (99 SC 2150, 60 LE2d 738) (1979). Green sought to introduce the testimony of one Thomas Pasby, a close friend of his co-defendant, Moore, to the effect that Moore admitted to Pasby that he alone shot the victim at a time when Green was not even present. This court affirmed the exclusion of the testimony as inadmissible hearsay. *Green v. State*, 242 Ga. 261

(249 SE2d 1) (1978). The U. S. Supreme Court reversed, holding that on the facts of that case the exclusion violated Green's due process rights for three reasons: first, it was "highly relevant to a critical issue in the punishment phase of the trial," *Green v. Georgia*, supra, 442 U. S. at 97; second, the excluded testimony bore substantial indicia of reliability because it was a spontaneous statement to a friend of Moore's, and there was no reason to attribute an ulterior motive to Moore in making it; and third, and perhaps most compelling, it was admitted against Moore at his trial and used by the state to procure a death sentence for Moore. Id. In this case, the excluded testimony was offered, if at all, during the guilt-innocence phase of trial. It does not bear the same indicia of reliability in that apparently the only witnesses who might be able to confirm the alleged confession are the defendant or his attorney, neither of whom are neutral third parties as was Pasby. Additionally, it was not admitted against Underwood in an attempt to procure a death penalty. Rather, she was allowed to plead guilty and received a life sentence for the murder.[3] Finally, we note that the strength of the testimony is unclear because the defendant made no offer of proof.

The trial court did not err in excluding Underwood's alleged confession.[4]

## Admissibility of Evidence

Several of the defendant's enumerations challenge the admission of evidence. He complains of the interjection of other crimes on numerous occasions, the admission of photographs of the victim, and the admission of his own statements. These enumerations will be addressed seriatim.

9. The defendant enumerates as error what he contends was the constant interjection of evidence of other crimes unrelated to the crimes for which he was on trial. He relies on the line of cases exemplified by *French v. State*, 237 Ga. 620, 621 (229 SE2d 410) (1976),

---

[3] Davis and Underwood were jointly indicted. The indictment is a part of the record; under her name it bears a notation indicating that she pled guilty on June 13, 1985, and was sentenced to life for the murder; 20 years to be served consecutively to the life term for the armed robbery; and 20 years to be served concurrently with the other 20-year term for bringing stolen property into the state.

[4] The defendant did not attempt to put Underwood on the stand, or to introduce her alleged confession, in the sentencing phase of the trial, and our holdings in Divisions 7 and 8 relate only to the guilt-innocence phase. We note that it was clear at trial that the trial court's ruling pertained only to the guilt-innocence phase. After the court ruled that the defendant could not put Underwood on the stand, her attorney asked if he needed to remain available: "There is a possibility she could be called again in the sentence phase. You know, I don't know whether it's necessary for me to be here. . . ." The Court responded, "I don't know what Mr. Hagler's intentions are at this time, Mr. Mobley. I guess you'd have to be here." The transcript indicates that Hagler was present during this colloquy.

where this court said: "Before evidence of independent crimes is admissible, two conditions must be satisfied. First, there must be evidence that the defendant was in fact the perpetrator of the independent crime. Second, there must be sufficient similarity or connection between the independent crime and the offense charged, that proof of the former tends to prove the latter." The defendant makes no issue of the first prong and identity is in fact well established, but he argues strenuously that a substantial amount of evidence was inadmissible under the second prong. He ignores, however, the fact that the second prong of *French* is simply not applicable in the circumstances presented here. The other crimes complained of here were not independent crimes: (a) they were all either part of the crime spree that began with the theft of Sambucca's car in Philadelphia and proceeded inexorably to its climax with the murder of Susan Isham in Georgia and on through their flight back to the Philadelphia area and the disposition of property stolen from Isham here, or (b) they were part of the evidence explaining the murder itself; i.e., the evidence tending to establish that there the defendant had drugs in his possession, that he sold drugs, and that he was involved in a drug transaction with the victim. *Ingram v. State*, 253 Ga. 622 (6) (323 SE2d 801) (1984), cert. denied, 105 SC 3538, 87 LE2d 661 (1985); *Chambers v. State*, 250 Ga. 856 (2) (302 SE2d 86) (1983).

10. Defendant complains of the introduction of eleven photographs by the state. Of these, only six show the victim; the rest depict the motel, the room, a pair of boots in the room, and miscellaneous items (the contents of the victim's pocketbook) scattered on a bed. Of the six pictures of the victim, one is a closeup of her face after death, two show her body lying face down and one shows it lying face up, one shows her feet and the curling iron next to them, and one, taken from the bedroom of her body as it lay on the bathroom floor, shows her legs and feet. In none was the body tampered with except to turn it over so that the cord and the marks from the cord could be seen. We find that the pictures were not unduly repetitive and were relevant. The trial court did not err in admitting them. *Brown v. State*, 253 Ga. 363 (1) (320 SE2d 539) (1984); *Allen v. State*, 253 Ga. 390 (1) (321 SE2d 710) (1984), cert. denied, 105 SC 1774, 84 LE2d 834 (1985). Nor did the trial court err in admitting a photograph of the victim in life. *Mincey v. State*, 251 Ga. 255 (11) (304 SE2d 882), cert. denied, 464 U. S. 977 (1983).[5]

11. The defendant enumerates as error the trial court's ruling

---

[5] In connection with this enumeration, the defendant argues that he was deprived of fundamental fairness by the state's developing a theme of the victim's worth and the loss to her family. He also argues such references deprived him of a reliable sentencing hearing. Having reviewed the transcript, we conclude that this enumeration is without merit. While

that his two confessions were voluntary and admitting them into evidence. The first confession was given to Detective Rosenstein of the Philadelphia Police Department. During a hearing conducted pursuant to *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964), Rosenstein testified that he went to New Jersey to question the defendant on January 12, 1984; that the interview commenced at 11:49 a.m. and lasted about half an hour; that a second interview in which another officer participated followed the first and lasted until about 5 p.m.; that at the end of the day, after Davis had confessed to the crimes for which he was tried in Georgia, a detective investigating a robbery in Philadelphia for which there was an existing warrant for the defendant was brought in; that he saw him only on that day; that he advised him of his rights and the defendant waived them; and that he did not make any promises or threats to induce the defendant to confess.

The defendant's version was remarkably different from Rosenstein's. He testified that he left the county jail about 8 a.m. and was taken to the DA's office for questioning; that all day long he was interrogated by two teams of detectives, one of which was made up of Rosenstein and his partner; that he did not get back to prison until 9 that evening; that from the time of his arrest on the evening of the 11th throughout the next day he kept asking for an attorney and was told he did not need one; that he did not answer any questions or give any statements on the 12th; that again the next day he was taken from the jail at about 8 a.m. to the same building; and that finally he made a statement after having been promised that the Pennsylvania charges against Underwood and him would be dropped, that Underwood would be held only as a material witness, and that if he cooperated fully he would receive a prison term.

The trial court, having heard all the evidence, ruled that the confession was voluntary and admitted it. Clearly this involved a determination that Rosenstein was the more credible witness. "Unless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of a confesssion will be upheld on appeal." *Gates v. State*, 244 Ga. 587, 590-91 (261 SE2d 349) (1979), cert. denied, 445 U. S. 938 (1979). The evidence was sufficient to support the trial court's ruling. *Lego v. Twomey*, 404 U. S. 477 (92 SC 619, 30 LE2d 618) (1972). We find no error in admission of the first confession.

A hearing pursuant to *Jackson v. Denno*, supra, was also held to determine the admissibility of the second confession. A Georgia

the prosecutor did speak favorably of the victim, his references were restrained and few and far between.

detective, David Hopkins, testified that he went to New Jersey and interviewed the defendant on the 21st of January; that the first thing that he did was advise him of his rights and have him sign a waiver; that the defendant did not ask for a lawyer; and that he made no threats and offered no inducements to the defendant. The defendant did not testify but asked that the court consider his previous testimony (that he had requested an attorney earlier). The trial court did not err in ruling that the statement was voluntary and admissible. Id.

12. Defendant complains that Detectives Rosenstein and Hopkins violated the rule of sequestration, resulting in a denial of his right to a fair trial. The transcript shows that they did converse after Rosenstein testified concerning the defendant's first confession, and before Hopkins testified outside the presence of a jury in a Jackson-Denno hearing regarding the second confession. Hopkins testified that the only thing he learned in their conversation that touched on Rosenstein's testimony was that part of the first confession was redacted. Subsequent to this conversation, Hopkins did not testify before the jury.

Assuming, arguendo, that the conversation between the officers constituted a violation of the rule of sequestration, the trial court did not err in overruling the defendant's motion to exclude Hopkins' testimony on this issue. A violation of the rule affects credibility, not admissibility. *Jones v. State*, 253 Ga. 640 (4) (322 SE2d 877) (1984). Furthermore, any error was rendered harmless because Hopkins did not testify again after the motion to exclude his testimony was denied. His partner did testify before the jury as to the voluntariness of the confession, and the only defense was that the defendant had requested an attorney prior to giving his first confession to Rosenstein, a contention which the trial court had already rejected.

### *Other Enumerations of Error*

13. At a pre-trial hearing, the defendant called one of the assistant district attorneys who later prosecuted the case, Douglas Pullen, to the stand. Pullen testified that some 3 or 4 years earlier the victim's father, who was in a roofing business, had roofed his house. He said that he had had perhaps half a dozen chance encounters with Mr. Isham since then, that he respected him and always made it a point to speak to him, and that he addressed Isham by his first name and had told Isham to use his first name but Isham continued to call him Mr. Pullen. Pullen also testified that his position that this was an appropriate case in which to seek the death penalty was based on the facts of this case and not on his acquaintance with the victim's father.

The defendant moved to disqualify Pullen from participating in the case because he was acquainted with the victim's family and be-

cause he opposed letting the defendant plead guilty in return for a life sentence. The trial court did not err in overruling the motion. There is no indication that Pullen's slight acquaintance with the victim's father affected his professional judgment.

14. The indictment against the defendant was returned on January 31, 1984. His representation was at first undertaken by the public defender's office; on March 27, 1984, the trial court appointed attorneys Richard Hagler and Stephen Hyles to represent him. Hagler and Hyles filed numerous motions on defendant's behalf including a challenge to the array of the grand jury and objection to grand jury (June 29, 1984); a demand for a copy of the indictment and a list of witnesses and a defense discovery motion (June 29, 1984); a motion to preserve evidence (August 6, 1984); a request for discovery of defendant's statements (August 6, 1984); a motion for discovery (August 6, 1984); a motion for funds for employment of an independent investigator (August 6, 1984); a motion to compel to not pursue the death penalty (August 6, 1984); a demand for a list of the witnesses who testified before the grand jury (August 6, 1984); a request for discovery of scientific reports (August 6, 1984); a motion for psychiatric assistance (August 8, 1984); a demand for trial (October 2, 1984); a motion in limine (October 2, 1984); a motion for a preliminary hearing (October 2, 1984); a motion for change of venue (October 10, 1984); a motion to recuse the trial judge (October 10, 1984);[6] and a motion to disqualify the assistant district attorney (October 10, 1984).

Hagler and Hyles also participated in hearings on June 29, 1984; August 22, 1984; and December 17, 1984. Toward the end of the December 17 hearing, Hyles suggested that the court should, in accordance with the Unified Appeal procedure, ask the defendant if he was satisfied with his counsel. The court did so, and Davis answered that he was not satisfied and he was relieving them. The court pointed out that Davis did not have the authority to discharge his appointed counsel and then let Davis voice his objections. He had three main complaints — one, that they were not doing anything; two, that Hyles had discussed his case with another of his clients who was also an inmate at the prison; and three, that Hagler had "lied" when he told Davis that Underwood had refused to testify at the August 22 hearing. The trial court overruled the defendant's objections.

Later at the close of the evidence, while the jury was deliberating on the guilt or innocence of the accused, and subsequent to the verdicts of guilt being returned but prior to the sentencing phase, the trial judge asked the defendant if he objected to the way his attorneys had handled the case and he said he did. He did not elaborate, but

---

[6] On December 17, defendant's attorneys filed a motion to dismiss this motion.

instead relied on his earlier complaint and on general allegations that they were not doing a good job. Each time the trial court found that they had been competent attorneys and represented him well.

As the Unified Appeal Procedure contemplates, 246 Ga. A-1, A-8-11, the defendant was given an opportunity to voice his complaints and the trial court was in a position to evaluate them. The record supports the trial court's conclusions and we find no error. *Smith v. Francis*, 253 Ga. 782 (1) (325 SE2d 362) cert. denied 106 SC 260, 88 LE2d 266 (1985).

15. The defendant complains that the trial court erred in refusing to charge on the lesser included offenses of robbery, theft, involuntary manslaughter, hindering apprehension, or concealing a death. In fact, the only charges on "lesser included offenses" which he requested were those on concealing a death and theft by taking, and those requests were made orally. The failure to charge on a lesser included crime is not error in the absence of a *written* request. *Maher v. State*, 239 Ga. 305 (5) (236 SE2d 647) (1977); *State v. Stonaker*, 236 Ga. 1 (222 SE2d 354) (1976).

16. The defendant contends that continual misconduct by the prosecutors throughout the guilt-innocence proceedings deprived him of a fair trial. He cites numerous instances of alleged misconduct, grouping them under the categories of misstatements of the law, statements of personal opinion, references to the penalty phase, improper cross-examination of the defendant, insulting the integrity of the defense counsel, untrue statements of fact, and closing argument. We have reviewed each reference to the transcript and considered each argument made by the defendant. We note that many of the objections he attempts to raise on appeal were not made at trial and were therefore waived. In other instances, his objections were sustained. Additionally, many simply do not constitute misconduct. To the extent that the prosecutor may have overstepped his bounds, he did not do so to an extent that resulted in reversible error. *Ford v. State*, 255 Ga. 81 (8i) (335 SE2d 567) (1985).[7]

*Penalty Phase*

17. The defendant also contends that misconduct of the prosecutors during the penalty phase of the trial deprived him of a fair sentencing procedure. He argues that the prosecutors misstated the law during voir dire, but in each instance the prosecutor either did not misstate the law, or there was no objection, or both. He reiterates an

---

[7] We note that it follows that the alleged misconduct in the guilt-innocence phase did not result in the death penalty being imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1).

objection to a comment the prosecutor made to a juror during voir dire, but the transcript reveals his objection was sustained and the juror was instructed to disregard the comment. And he contends that the prosecutor "strayed far beyond the bounds of legitimate closing argument." We disagree. The prosecutor did refer to the victim's family's loss, and he briefly referred to "how nice" the victim was. These comments did not constitute error. *Brooks v. Kemp*, 762 F2d 1383, 1410 (11th Cir. 1985). Nor did he err in arguing that the defendant was himself responsible for his acts, and his punishment. Id. at 1410-11.

In addition to considering the defendant's specific complaints about the closing argument, we have reviewed it in its entirety. We conclude that it did not result in the sentence of death being imposed under the influence of passion, prejudice or any other arbitrary factor. OCGA § 17-10-35 (c) (1).

18. Relying on *Enmund v. Florida*, 458 U. S. 782 (102 SC 3368, 73 LE2d 1140) (1982), the defendant argues that the death penalty cannot stand because there is no jury finding that he killed, intended to kill, or attempted to kill the victim. This is simply not the case. In the sentencing phase the court instructed the jury as follows: "I further charge you that the sentence of death shall not and cannot be imposed unless you find beyond a reasonable doubt that the defendant, A, committed the murder himself or, B, he himself attempted to kill the victim or, C, intended that deadly force be used by another to accomplish the criminal enterprise." This fully satisfies *Enmund*. See also *Cabana v. Bullock*, __ U. S. __ (106 SC 689, 88 LE2d 704) (1986).[8]

19. The defendant contends in this appeal that the introduction of "a plethora of prior convictions" violated his right to a reliable sentencing hearing. This issue was not preserved for appeal, however, because at trial the defendant stipulated to the admissibility of the convictions. Moreover, we note that in the sentencing phase the defendant's character is in issue and his prior convictions are relevant and admissible. OCGA § 17-10-2; *Fair v. State*, 245 Ga. 868, 871 (268 SE2d 316) cert. denied 449 U. S. 986 (1980).

20. The defendant argues that the evidence is insufficient to support the jury's verdict finding two statutory aggravating circumstances.

The jury was charged on two aggravating circumstances and returned a verdict finding both; to wit: "The offense of murder was

---

[8] Partly because of the clarity of this charge, and partly because it was a part of the sentencing phase charge (which did not include any reference to the culpability of parties to a crime), we conclude that the charge was not susceptible to being misunderstood. Cf. *Cabana v. Bullock*, supra, 106 SC 689, 695, n. 2.

committed while the defendant was engaged in the commission of another capital felony to wit, armed robbery. The offense of murder was outrageous and wantonly vile, horrible or inhuman in that it involved torture." These statutory aggravating circumstances are set out at OCGA § 17-10-30 (b) (2) (7), respectively. The charge on the statutory aggravating circumstance set forth at OCGA § 17-10-20 (b) (7) was virtually identical to the proposed charge recommended by this court in *West v. State*, 252 Ga. 156, 161 (Appendix) (313 SE2d 67) (1984).

The jury, having been properly charged, found that the murder was outrageously and wantonly vile, horrible and inhuman and involved torture. Having reviewed the evidence, we hold that it is sufficient to support this finding, as well as the finding that the murder occurred while the defendant was engaged in the commission of an armed robbery. OCGA § 17-10-35 (c) (2); *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). A jury may find an electric cord to be an offensive weapon within the meaning of our armed robbery statute, OCGA § 16-8-41 (a), depending upon the manner and means of its use. *Simmons v. State*, 149 Ga. App. 830, 832 (256 SE2d 79) (1979).

21. The defendant's arguments that, as applied to this case, OCGA § 17-10-30 (b) (7) is unconstitutionally vague and creates an unacceptable risk of error in sentencing, and that the charge on OCGA § 17-10-30 (b) (7) was "unacceptably duplicitous," are without merit.

22. The defendant contends that the court's charge on mitigating circumstances was constitutionally deficient because (1) it did not define the term, (2) it did not define what they are by identifying those offered by the defendant, and (3) it did not instruct the jury that it must consider all evidence offered in mitigation. The first and third complaints are simply incorrect. The court charged: "You shall also consider the facts and circumstances if any in extenuation, mitigation and aggravation of punishment. Mitigating or extenuating facts or circumstances are those which do not constitute a justification or excuse for the offense in question but which in fairness and mercy may be considered as exentuating or reducing the degree of moral culpability or blame." It is not necessary that the court identify mitigating circumstances offered by the defendant. *Smith v. State*, 249 Ga. 228 (2) (290 SE2d 43), cert. denied, 459 U. S. 882 (1982); see *Ross v. State*, 254 Ga. 22, 32-33 (326 SE2d 194), cert. denied, 105 SC 3490, 87 LE2d 623 (1985). We hold that the charge on mitigating circumstances was adequate and proper. This enumeration is without merit.

23. The defendant contends that his death penalty must be set aside because the evidence in *McCleskey v. Kemp*, 753 F2d 877 (11th Cir. 1985) (en banc) establishes that the death penalty has been im-

posed in Georgia, and particularly in Muscogee County, in a discriminatory manner against blacks, males, poor persons and those accused of killing whites. The defendant did not raise this issue below, and it was decided adversely to his position in *McCleskey*, supra.

24. On February 3, 1984, the state, through the district attorney, William Smith, announced in open court its intention to seek the death penalty. At that time, the judge appointed the public defender, Richard Smith, to represent the defendant. After that, the district attorney communicated to the public defender an offer of life imprisonment for the murder if the defendant would plead guilty. The public defender met with the defendant and communicated the offer to him. According to the public defender, he discussed the case fully with the defendant, and it was his impression that the defendant wanted to accept the offer, and he told the district attorney that the defendant would accept the offer and plead guilty. On March 22, the public defender again visited the defendant and the defendant told him he would not plead guilty.

On March 23, the defendant pled not guilty, and the state advised him through the public defender that it was withdrawing the offer and would seek the death penalty. Shortly thereafter, additional counsel who took over the case were appointed. The defendant decided he did want to plead guilty in exchange for a life sentence, but the state declined to revive the offer. Defendant's counsel moved to compel the state to reinstate the offer, and a hearing was held on the motion. The defendant testified that he did not think the judge had appointed the public defender to represent him on February 3 and that the only reason he would not plead guilty on March 23 was because he had not had an opportunity to talk to a lawyer. He conceded that he knew the public defender was a lawyer but said he did not think he was his lawyer. Thus he contends that withdrawal of the offer before he had a chance to speak with his attorney offended his Sixth Amendment right to counsel.

The trial court overruled the defendant's motion to compel the state to reinstate the offer. We find no error. Assuming arguendo that a defendant has a right to consult with counsel before an offer to plea bargain is withdrawn, in this case the trial court found that the defendant did consult with his attorney. This finding is supported by the evidence. The evidence does not support the defendant's allegation that the offer was withdrawn because of Assistant District Attorney Pullen's acquaintanceship with the victim's father, or that that relationship introduced an element of prejudice into the decision to seek the death penalty.

Prior to trial, the defendant served subpoenas on District Attorney Smith and Assistant District Attorney Pullen, with an eye toward questioning them during the sentencing phase of trial about the offer

of a life sentence. The state's motion to quash the subpoenas was granted.

Prior to the sentencing phase, the state made a motion in limine to exclude any evidence of the offer to plea bargain. The court granted the motion on the ground that the fact that the defendant had been offered an opportunity to plead guilty to the murder in exchange for a life sentence was irrelevant. We agree.[9] It is neither mitigating nor aggravating; i.e., it does not relate to the defendant's character, prior record, or to the circumstances of the offense; therefore it is correctly excluded as irrelevant. OCGA § 17-10-30 (b); *Wilson v. State*, 250 Ga. 630, 639 (300 SE2d 640), cert. denied, 404 U. S. 865 (1983). The fact that a defendant has withdrawn a guilty plea would be inadmissible against him. Similarly, the fact that the state had withdrawn its offer should be inadmissible. A contrary rule would deter or preclude plea bargaining by the state to the detriment of other defendants.

25. During its deliberations on the sentence, the bailiff informed the court that the jury had two questions: "They wanted to know if he received life would he spend life in jail. And the next question was did the vote have to be unanimous." With the consent of counsel the court advised the bailiff as follows: "The Court cannot answer the first question. You tell them that. And as to the second question, must the verdict be unanimous, the answer of the Court is yes, that it must be unanimous." No further discussion was had on the question about a unanimous verdict. Subsequently, however, the jury pursued the other question, asking if a person convicted of murder could be paroled. The court instructed the jury that it could not answer the question. The defendant enumerates as error the court's response to each question.

The trial court did not err in informing the jury that its verdict had to be unanimous; that was a correct statement of the law. *Parks v. State*, 254 Ga. 403 (14) (330 SE2d 686) (1985); *Allen v. State*, 253 Ga. 390 (2) (321 SE2d 710) (1984), cert. denied, 105 SC 1774, 84 LE2d 834 (1985); *Legare v. State*, 250 Ga. 875, 876 (302 SE2d 351) (1983).

Likewise, the trial court did not err in declining to answer the jury's questions about whether the defendant would spend the rest of his life in jail if he was given a life sentence. We note that defendant's trial counsel stated, when asked, that he was content with the court's answer: "Judge, I don't know what else you can do unless you recharge them on the same thing. I don't think you're permitted to comment on it. If the Court wants to recharge we would be content

---

[9] A different question might be presented if a defendant sought to introduce evidence in the sentencing phase of trial that he had offered to plead guilty but the state refused the offer.

with that. I don't know if that answered their question."

The defendant argues on appeal that the jury should have been told that if the defendant were given consecutive life sentences for the murder and armed robbery, he would have to serve 20 years before becoming eligible for parole. OCGA § 42-9-39 (c). Because this issue may again arise, we will address it even though the trial court did not err in not giving such a response in this case simply because it was not requested.

Since 1974, in all cases in which a sentencing decision must be made, except for those in which death is a possible sentence, the trial court, not the jury, sentences the defendant. OCGA § 17-10-1 (a). Thus the question of what the jury may be told relevant to parole arises only in death penalty cases. Prior to 1974, however, juries did sentence criminal defendants. Ga. L. 1964, pp. 483, 484; Ga. L. 1919, p. 387, amended by Ga. L. 1950, p. 352; repealed by Ga. L. 1964, p. 483. A 1955 act provided that: "No attorney at law in a criminal case shall argue to or in the presence of the jury that a defendant, if convicted, may not be required to suffer the full penalty imposed by the court or jury because pardon, parole, or clemency of any nature may be granted. . . ." OCGA § 17-8-76 (a). As this court recognized in *McGruder v. State*, 213 Ga. 259, 266-67 (98 SE2d 564) (1957), "This act of the General Assembly establishes the policy of the law that the jury should not be influenced in a criminal case in the rendition of their verdict by a consideration of the fact that the penalty imposed by them might be commuted by the State Board of Pardons and Paroles." As *McGruder* established by reviewing the cases which preceded passage of this law, it was meant to protect the defendant by foreclosing argument to the jury that the possibility of parole was a reason not to recommend mercy. While OCGA § 17-8-76 (a) therefore benefits defendants in many cases, its prohibition is not limited to cases where the prosecutor would argue parole in order to obtain a more severe sentence. Rather it proscribes all use of parole in argument. *Horton v. State*, 249 Ga. 871 (4) (295 SE2d 281) (1982), cert. denied, 459 U. S. 1188 (1983). It expresses a policy "not to allow argument or charge on matters concerning parole." Id.

This is a salutary policy, and one which we adhere to. To allow comment about the possibility of parole will not benefit defendants on trial for their life because parole is, in fact, a possibility. See OCGA §§ 42-9-39 (c); 42-9-45 (b). While an individual defendant may wish to establish reversible error based on a trial court's failure to explain to the jury that the defendant may be paroled if given a life sentence, allowing such explanations would introduce an inappropriate element into the jury's deliberations. The jury should not be encouraged to recommend the death penalty because it fears that parole officials may grant parole if the defendant is given a life sentence.

Thus the best policy is simply to proscribe all reference to parole. We adhere to *Horton v. State,* supra.

26. The defendant asserts his right under the Unified Appeal Procedure to review of all assertions of error timely raised. 246 Ga. at A-16 (IV) (B) (2). As seen above, this case was tried pursuant to the Unified Appeal Procedure and has been reviewed pursuant to that procedure.

27. We find that the defendant's sentence to death is neither excessive nor disproportionate to sentences imposed in similar cases generally. OCGA § 17-10-35 (c) (3). The cases listed in the appendix support the affirmance of the death penalty.

28. We find that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1).

*Judgment affirmed. All the Justices concur.*

DECIDED MARCH 11, 1986 —
RECONSIDERATION DENIED APRIL 1, 1986.

*H. Haywood Turner III,* for appellant.

*William J. Smith, District Attorney, J. Gray Conger, Douglas C. Pullen, Assistant District Attorneys, Michael J. Bowers, Attorney General, Eddie Snelling, Jr., Staff Assistant Attorney General,* for appellee.

APPENDIX.

*Roberts v. State,* 252 Ga. 227 (314 SE2d 83) (1984); *Williams v. State,* 250 Ga. 553 (300 SE2d 301) (1983); *Jones v. State,* 249 Ga. 605 (293 SE2d 708) (1982); *Berryhill v. State,* 249 Ga. 442 (291 SE2d 685) (1982); *Solomon v. State,* 247 Ga. 27 (277 SE2d 1) (1981); *Baker v. State,* 243 Ga. 710 (257 SE2d 192) (1979); *Amadeo v. State,* 243 Ga. 627 (255 SE2d 718) (1979); *Stanley v. State,* 240 Ga. 341 (241 SE2d 173) (1977); *Corn v. State,* 240 Ga. 130 (240 SE2d 694) (1977); *Street v. State,* 237 Ga. 307 (227 SE2d 750) (1976); *Pulliam v. State,* 236 Ga. 460 (224 SE2d 8) (1976); *Dobbs v. State,* 236 Ga. 427 (224 SE2d 3) (1976).