S97P0804. SEARS v. THE STATE.
(493 SE2d 180)

FLETCHER, Presiding Justice.

A jury convicted Demarcus Ali Sears of the armed robbery and kidnapping with bodily injury of Gloria Ann Wilbur.[1] The jury found as aggravating circumstances that the kidnapping with bodily injury was committed while Sears was engaged in the capital felonies of armed robbery, rape, and murder, and that the kidnapping with bodily injury was outrageously vile, wantonly vile, horrible, and inhuman, in that it involved torture to the victim before death, depravity of mind of the defendant, and aggravated battery to the victim before death.[2] Sears was sentenced to death for the kidnapping with bodily injury. We affirm the jury's verdict of guilt, but because the trial court improperly restricted Sears from contacting jurors to investigate his claim of jury misconduct, we remand to allow Sears to develop a record on that issue.

The evidence showed that on the afternoon of October 7, 1990, Demarcus Sears and Phillip Williams were walking through Atlanta because their car had broken down. Wanting to return home to Ohio, where they lived, they walked to a Waffle House in Smyrna and tried to borrow money from several patrons in the restaurant. They told the patrons that their car had broken down and they needed money to go to Cincinnati. Sears carried a black briefcase that contained brass knuckles, knives and a set of old handcuffs that was missing a key. He opened the briefcase in the restaurant and tried to sell some of the items to a customer. After receiving directions and a couple of dollars for bus fare, Sears and Williams walked to a nearby Kroger

---

[1] The crimes occurred on October 7, 1990 and October 8, 1990. The grand jury indicted Sears on April 11, 1991 and the state filed its notice of intent to seek the death penalty on April 23, 1991. An interim appeal was taken and decided February 26, 1993. *Sears v. State,* 262 Ga. 805 (426 SE2d 553) (1993). Jury selection began on September 13, 1993 and the trial began on September 20, 1993. The jury returned its verdict in the guilt-innocence phase on September 22, 1993 and its verdict in the penalty phase of death on September 25, 1993. The trial court sentenced Sears to death for kidnapping with bodily injury and to life in prison for armed robbery. Sears filed a motion for new trial on October 14, 1993, which he amended on June 20, 1996. The trial court denied the motion on July 18, 1996. Sears filed his notice of appeal on August 19, 1996, and it was originally docketed in this court on October 23, 1996. The case was remanded to the trial court for completion of the record on November 8, 1996, and re-docketed on February 24, 1997. Oral argument was held on July 8, 1997.

[2] OCGA § 17-10-30 (b) (2), (7).

food store. A police officer observed them loitering near the Kroger parking lot and briefly spoke with them before he left in response to a radio call. Subsequently, they decided to steal a car so they could drive back to Cincinnati.

They spotted the victim, Gloria Wilbur, when she parked her 1985 Buick and entered the Kroger. Around 8:00 p.m., Ms. Wilbur returned to her car and placed her groceries in the trunk. Sears approached her, struck her with the brass knuckles and forced her into the car. Williams then got behind the wheel and they drove north on I-75. Sears told Ms. Wilbur to keep quiet, pulled her into the back seat, and handcuffed her with her hands behind her back. When they stopped for gas and hamburgers, Sears wedged Ms. Wilbur down between the seats and covered her with book bags to prevent discovery. While they were driving through Tennessee, he raped her.

They crossed the border into Kentucky around 1:00 a.m. and stopped the car. Despite her pleas to remain in the car, Sears took the victim into the bushes along I-75 and stabbed her to death. Ms. Wilbur's body was found, still handcuffed, almost a week later. Her abandoned Buick was discovered in a Cincinnati suburb. Bloodstains in the car matched the victim and pubic hair taken from the back seat matched Sears.

Based on an identification by witnesses at the Waffle House and a tip from an Ohio informant, the police questioned Williams and Sears. Both men gave statements. Sears admitted that he had taken the Buick and kidnapped, raped and killed the victim. His statement matched Williams' statement, except that Sears claimed that it was Williams who had struck Ms. Wilbur with the brass knuckles and Williams claimed that it was Sears. Both men stated that only Sears had raped and stabbed her. Sears also consented to a search of his mother's house, where he lived, and was escorted by police to this residence. He took the police to his room and showed them the black briefcase and brass knuckles. Williams pled guilty in exchange for two life sentences and testified for the state at Sears' trial.

1. After reviewing the evidence in the light most favorable to the jury's determination of guilt, we conclude that a rational trier of fact could have found Sears guilty of the crimes charged beyond a reasonable doubt.[3]

*Pre-trial issues*

2. Sears challenges the trial court's ruling that required him to reveal the identity of his expert witnesses and their written reports

---

[3] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

as a violation of this court's decision in *Rower v. State*.[4] In *Rower*, we held that the state may discover any written reports of experts that the defendant intends to introduce at trial. The defendant is not required to have the opinions of his experts reduced to writing nor is he required to produce any report that he will not offer at trial.[5]

The record fails to support Sears' assertion that the trial court required his experts to provide written reports and release them to the state. Sears initially sought public funds to hire a psychiatrist, microanalyst, and forensic odontologist and filed a motion in limine to bar the state from calling his expert witnesses at trial. Before the trial court could rule on the motions, and without presenting any argument at the ex parte hearing, Sears withdrew his motion for funds for a psychiatrist to assist in the guilt-innocence phase of the trial. The trial court later approved the hiring of a microanalyst and forensic odontologist to review the materials used by the state's expert to establish the identity of the victim. In approving their employment, the trial court ordered Sears to reveal their identity to the state. At no time did the trial court order the defendant's experts to produce written reports and give them to the state. Given that Sears withdrew his request for a psychiatrist before any court ruling, did not consult a microanalyst, and eliminated the need for the odontologist's testimony by stipulating at trial to the victim's identity, he has failed to show any chilling effect or other harm from the ruling that he must give the name of his experts to the state.[6]

3. Sears contends that the trial court erred by denying his pretrial motion to compel the state to provide the juvenile record of a state witness. Phillip Williams, Sears' accomplice, had several prior juvenile adjudications in Ohio for robbery and theft and a pending juvenile action for forgery. Under Ohio law, juvenile criminal records are not public records because they are sealed.[7] According to Sears, Williams' juvenile record amounted to exculpatory evidence under *Brady v. Maryland*[8] and should have been provided to the defense for impeachment purposes. Sears maintains that the failure of the state to deliver certified copies of Williams' juvenile records to the defense denied Sears his right to fully confront and cross-examine Williams.[9]

---

[4] 264 Ga. 323 (443 SE2d 839) (1994).

[5] *Johnson v. State*, 265 Ga. 833, 834 (463 SE2d 123) (1995).

[6] See *Wellons v. State*, 266 Ga. 77, 81-82 (463 SE2d 868) (1995); *Mobley v. State*, 265 Ga. 292, 294 (455 SE2d 61) (1995).

[7] Ohio Rev. Code Ann. § 2151.358.

[8] 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

[9] *Davis v. Alaska*, 415 U. S. 308, 319 (94 SC 1105, 39 LE2d 347) (1974) (state's interest in secrecy of juvenile proceedings trumped by defendant's right to confront and cross examine witness in order to show bias to prosecution resulting from pending juvenile action).

It is undisputed, however, that Sears had access to the state's file in this case and that Williams' Ohio juvenile records were not a part of that file. *"Brady* does not impose an affirmative obligation on the prosecution to seek out information for the defense, even if such information is more accessible to the prosecution than to the defense."[10] Therefore, the state is not required to provide to the defense the confidential out-of-state juvenile records of a state witness, when those records are not a part of the state's file.[11]

Even assuming that the state had a duty to obtain Williams' juvenile records, Sears failed to show that he was denied beneficial information that was so important that its absence prevented him from receiving a fair trial and materially prejudiced his case.[12] Sears' attorney discussed Williams' juvenile record in detail in his opening statement and cross-examined Williams about his former drug dealing and his plea of guilty to the crimes against Ms. Wilbur in exchange for two life sentences. A state witness also testified that Williams was being held at a juvenile detention center in Ohio at the time he was brought in for questioning on the crimes in Georgia. We find no error in the trial court's denial of the motion to compel the state to obtain Williams' juvenile records from Ohio.

4. The police obtained Sears' consent to search his mother's house and executed a warrantless search that uncovered several incriminating items, including brass knuckles and a black briefcase. "A valid consent obviates the need for a search warrant."[13] Sears alleges, however, that his consent was not freely and voluntarily given due to coercion, promises, and his drug-induced state. In order to determine whether the consent was voluntary, courts examine the totality of the circumstances surrounding the consent.[14] Demarcus Sears was eighteen years old, had an eleventh grade education, had been held by the police for less than two hours, was not subject to any physical or psychological duress, was advised of his constitutional rights and read and signed a form authorizing the search. We conclude that his consent to search was voluntary.

Sears also claims that he could not have given a valid consent to search his mother's house because he lacked the authority to consent to such a search. Sears informed the police before consenting that he was not the owner of the house and no longer lived there. The "consent to search" form executed by Sears has the words "property owner" crossed out under the signature block but also contains the

---

[10] *Hines v. State*, 249 Ga. 257, 258 (290 SE2d 911) (1982).

[11] See id.; *Lariscey v. State*, 254 Ga. 241, 243 (328 SE2d 213) (1985).

[12] See *Rose v. State*, 249 Ga. 628, 629 (292 SE2d 678) (1982).

[13] *Crowe v. State*, 265 Ga. 582, 587 (458 SE2d 799) (1995).

[14] See id.

words "and where I live with my mother" handwritten next to the description of the place to be searched. Although Sears maintains that he had objected to giving consent because he no longer lived at his mother's house, at a pretrial hearing on December 12, 1991, Sears repeatedly referred to the house as "my house" and there was further conflicting testimony about whether he still lived there. The evidence was sufficient to support the trial court's finding that Sears had given valid consent to a search of his mother's house. Even assuming that Sears no longer lived there and had no expectation of privacy in his mother's house, the authority to consent argument would be moot because Sears would lack standing to assert a Fourth Amendment violation.[15]

5. This court, on interim appeal, has already considered the admissibility of Sears' statement to the police and ruled adversely to Sears.[16]

### Jury Selection

6. Sears maintains that the trial court erred in failing to excuse for cause three potential jurors based on various biases that affected their ability to judge the case fairly. A review of the voir dire of each prospective juror shows that the trial court did not abuse its discretion in deciding that each juror was capable of impartial service and would consider both mitigating evidence and the trial court's instructions in determining the appropriate sentence.[17]

7. The trial court also did not err in excusing for cause a prospective juror who was a Vietnamese native, spoke Chinese at home, and exhibited difficulty in understanding and speaking English.[18]

8. The state used four of the six peremptory strikes that it exercised against African-American members of the jury panel and exercised its only strike during the selection of alternate jurors against an African-American. Sears contends that the state exercised three of its peremptory strikes in a racially discriminatory manner in violation of Batson v. Kentucky.[19] The state explained that it struck one juror because he expressed a mistrust for attorneys and the first witness for the state, the victim's husband, was an attorney; struck another juror because she was breast-feeding her ten-month-old and sequestration would create a hardship for both mother and child; and struck a third juror who was a psychiatrist because he had six acute

---

[15] See *Rakas v. Illinois*, 439 U. S. 128, 134 (99 SC 421, 58 LE2d 387) (1978).
[16] *Sears v. State*, 262 Ga. 805, 807 (426 SE2d 553) (1993).
[17] See *Wellons*, 266 Ga. at 84; *Mobley*, 265 Ga. at 295.
[18] See *Wellons*, 266 Ga. at 84; *Bennett v. State*, 262 Ga. 149, 151 (414 SE2d 218) (1992).
[19] 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986).

patients who needed constant attention and he had counseled prisoners in the past. In each instance, the trial court found that the state had offered a race-neutral reason for the strike and allowed the strike to stand. Because these findings are not clearly erroneous and Sears has failed to prove that the state acted with discriminatory intent in exercising its peremptory challenges, we conclude that there was no *Batson* violation.[20]

9. Although Sears argues on appeal that the state violated *J.E.B. v. Alabama*[21] by using five of its seven peremptory strikes to exclude men from the jury, Sears did not raise this objection at trial. Therefore, we decline to consider whether the state exercised its peremptory strikes with an intent to discriminate on the basis of gender.[22]

10. Since the state had authority to seek the death penalty, it was proper to qualify the jurors concerning the death penalty.[23]

### Guilt-Innocence Phase

11. Sears contends that the kidnapping with bodily injury was completed when he allegedly struck the victim with brass knuckles and forced her into the car in the Kroger parking lot. He claims therefore that evidence of the rape, which occurred in Tennessee and for which Sears was not charged, should have been ruled inadmissible because it was an independent crime that was highly prejudicial and not probative of the kidnapping. We disagree. The rape was not an independent crime because it was part of a continuous criminal enterprise that began with the robbery and kidnapping in Georgia and proceeded inexorably to the murder in Kentucky.[24] The rape evidence was also relevant to the robbery and kidnapping because it corroborated the statements of Sears and his accomplice and linked Sears to the crimes by explaining why pubic hairs from Sears were found in the back seat of the Buick.[25] The trial court did not err in admitting evidence of the rape.

12. Sears claims that GBI Special Agent Adrian McCravy testified about a matter of which he had no personal knowledge and this testimony amounted to impermissible character evidence. Specifically, Sears contends that Agent McCravy, after stating that Wil-

---

[20] See *Turner v. State*, 267 Ga. 149, 153 (476 SE2d 252) (1996); *Lingo v. State*, 263 Ga. 664, 669 (437 SE2d 463) (1993).

[21] 511 U. S. ___ (114 SC 1419, 128 LE2d 89) (1994).

[22] See *Childs v. State*, 257 Ga. 243, 257 (357 SE2d 48) (1987); *McKenzie v. State*, 223 Ga. App. 108, 113 (476 SE2d 868) (1996).

[23] *McMichen v. State*, 265 Ga. 598, 611-612 (458 SE2d 833) (1995).

[24] See *Davis v. State*, 255 Ga. 598, 606 (340 SE2d 869) (1986); *Todd v. State*, 261 Ga. 766, 771 (410 SE2d 725) (1991).

[25] See *Davis*, 255 Ga. at 606.

liams had been located in a juvenile detention facility, testified that Sears had been brought to the police station in the same car as Williams. This testimony, according to Sears, improperly implied that he had also been held in a juvenile facility. Sears maintains that Agent McCravy was not present when the two men were brought in for questioning and could not testify whether they were brought in together. We find no error because Sears' contentions are not supported by the record. The record reveals that Agent McCravy testified that he could not be sure if Sears and Williams were brought to the station in the same car because he did not assist in the transportation. In addition, other state witnesses clarified that Sears was not being held in the juvenile detention facility with Williams.

13. The trial court did not err by admitting several hearsay statements. Sears filed a motion in limine seeking to prevent the state from asking witness Willie Burge, who was at the Waffle House, about an opinion proffered to him by a woman that he should not go with the two men because they would kill him. The trial court granted the motion and the record reveals that the state did not elicit this opinion from Burge. Sears' arguments about other alleged hearsay statements are waived because he did not object to the statements at trial.[26]

14. The admission of two photographs of the victim's body was not so prejudicial as to amount to error. Sears claims that the photographs were not probative because the defense had stipulated to the identity of the victim and the body had been altered by the elements. We disagree. Although there had been some decomposition, the two photographs did not depict the decomposition to the face and chest area. Rather, they showed the victim's handcuffed body from the back, as it was found alongside the highway. Photographs of a body altered by the combined forces of the murderer and the elements, before autopsy, are generally admissible.[27] The two photographs, one picture of the entire body taken from behind and one close-up of the handcuffs and jewelry on the victim's hands, were relevant and not duplicative.

15. Sears claims that the prosecutor made a number of improper statements during the closing arguments in the guilt-innocence phase. Sears, however, failed to object to any portion of the state's arguments. "When no timely objection is interposed, the test for reversible error is not simply whether or not the argument is objectionable, or even if it might have contributed to the verdict; the test is whether the improper argument in reasonable probability changed

---

[26] *Earnest v. State*, 262 Ga. 494, 495 (422 SE2d 188) (1992).
[27] See *Baxter v. State*, 254 Ga. 538, 544 (331 SE2d 561) (1985).

the result of the trial."[28] Even assuming that the arguments were objectionable, we find no error sufficient to overcome Sears' procedural default.

16. (a) During the guilt-innocence phase, the trial court denied Sears' request to give an instruction on simple kidnapping as a lesser included offense. The evidence was undisputed that the victim was kidnapped, hit with brass knuckles and stabbed. The issue for the jury was whether Sears participated in the crime, not whether the bodily injury occurred. Therefore, the refusal to charge on simple kidnapping was proper since there was no evidence raising the lesser offense.[29]

(b) The trial court did not err in refusing to charge that kidnapping is a continuing offense as the requested charge was not adapted to the evidence; in refusing to charge that an element of kidnapping with bodily injury is that the bodily injury caused the victim's death because that is an incorrect statement of the law; in charging on conspiracy because the evidence supported such a charge;[30] or in refusing to charge that the evidence regarding the rape was admitted solely as an essential element of the crimes charged because evidence of the rape was admissible as discussed in Division 11, infra.

*Sentencing Phase*

17. Following trial and sentencing, Sears' post-conviction counsel sought and obtained funds in an ex parte hearing for an investigator to interview jurors.[31] When the state learned of this, it requested a hearing at which it objected to a private investigator interviewing jurors. The court then directed that there be no contact until Sears made a proffer of what he hoped to learn by such interviews. Although initially restricting only defense counsel, the court later expanded its order to ban contact by the state.

The state argues that banning contact was proper because a juror is incompetent to impeach the verdict. While this is the general rule in this state,[32] it is subject to exceptions and does yield to a defendant's constitutional guarantees.[33] It is well-established that jurors are competent to testify about improper influences that

---

[28] *Todd v. State*, 261 Ga. at 767.

[29] *Edwards v. State*, 264 Ga. 131, 133 (442 SE2d 444) (1994).

[30] *Huey v. State*, 263 Ga. 840, 842 (439 SE2d 656) (1994).

[31] Sears contends that jury misconduct occurred during the sentencing phase deliberations when the foreman and perhaps other jurors threatened the lone holdout juror and when the bailiff had improper communications with the jury.

[32] See OCGA § 17-9-41.

[33] *Oliver v. State*, 265 Ga. 653, 654 (461 SE2d 222) (1995); *Watkins v. State*, 237 Ga. 678, 685 (229 SE2d 465) (1976).

intrude upon their deliberations.[34] The possibility that information learned from jurors may not require a new trial should not preclude appellate counsel from exploring appropriate avenues of challenge.

Although the trial court's order left open the possibility of later jury contact, the order conditioned that possibility on counsel disclosing what such contact would uncover. This placed an impossible burden on counsel. Finally, we note that at the time the court banned all contact with jurors, there had been no suggestion that defense counsel or anyone on behalf of Sears had harassed any juror.

Considering all these circumstances, we conclude that the trial court erred in prohibiting counsel from contacting jurors and, therefore, we reverse that order and remand. On remand, Sears is entitled to a reinstatement of the trial court's order granting funds for an investigator and is entitled to have that investigator and his counsel contact jurors to investigate the claim of jury misconduct. Anyone seeking to speak with a juror must clearly inform that juror that he or she has the right to choose to answer questions and the right to decline the request. Following a reasonable time for investigation, Sears may present to the trial court evidence supporting his claim of jury misconduct.

18. Because we are remanding for further proceedings related to the sentencing phase, we need not decide at this time Sears' remaining enumerations of error related to the sentencing phase.

19. The death sentence is remanded for further proceedings consistent with Division 17 of this opinion, and for the entry of appropriate findings and conclusions of law on the issue of jury misconduct. After the conclusion of the proceedings on remand, the case shall be returned to this court for review of the proceedings on remand, for resolution of the remaining enumerations relating to the sentencing phase, and for sentence review, unless the result of the proceedings on remand obviates the need for further appellate review.

*Judgment affirmed in part and remanded in part. All the Justices concur, except Carley, J., who concurs in part and dissents in part.*

CARLEY, Justice, concurring in part and dissenting in part.

I concur in the judgment affirming the conviction of Sears. As to

---

[34] *Watkins*, 237 Ga. at 683-685 (jurors competent to testify about unauthorized visit to crime scene); *Steele v. State*, 216 Ga. App. 276 (454 SE2d 590) (1995) (jurors testified that they relied on another juror's independent research in reaching decision). See also *State v. Kelley*, 517 NW2d 905, 910 (Minn. 1994) (overt acts of coercion by juror may constitute juror misconduct). See generally Susan Crump, *Jury Misconduct, Jury Interviews, and the Federal Rules of Evidence: Is the Broad Exclusionary Principle of Rule 606(b) Justified?*, 66 N.C. L. Rev. 509, 539 (1988) (whether new trial is warranted should depend on seriousness of influence and objectively reasonable effect on jury's verdict).

the sentencing phase, however, I cannot agree that the trial court erred in prohibiting counsel from contacting jurors. In my opinion, therefore, a remand is not necessary and both the judgment of conviction *and* the death sentence entered by the trial court should be affirmed.

As the majority points out, the general rule in this state is that jurors are incompetent to impeach their own verdict. OCGA § 17-9-41; *Oliver v. State*, 265 Ga. 653, 654 (3) (461 SE2d 222) (1995). This rule applies in death penalty cases. *Spencer v. State*, 260 Ga. 640, 643 (3) (398 SE2d 179) (1990); *Hall v. State*, 259 Ga. 412, 414 (3) (383 SE2d 128) (1989). This court has recognized constitutional limitations to the rule only in rare circumstances, where members of the jury intentionally gather extrajudicial and prejudicial evidence and communicate such information to the other jurors, or where non-jurors have interfered with the jury's deliberations. *Spencer v. State*, supra at 643 (3); *Watkins v. State*, 237 Ga. 678, 685 (229 SE2d 465) (1976). "The rule is deeply rooted in Georgia law and promotes important public policy considerations." *Oliver v. State*, supra at 654 (3).

> The rule discourages post-verdict harassment of jurors, enhances verdict finality and certainty, encourages free and open discussion among jurors during deliberations, and insulates jury value judgments from judicial review.

*Spencer v. State*, supra at 643 (3).

Similarly, prohibiting post-verdict interviews protects the jury from post-verdict misconduct and the courts from time-consuming and futile proceedings, and reduces the "chances and temptations" for tampering with the jury. *Haeberle v. Texas Intl. Airlines*, 739 F2d 1019, 1021 (5th Cir. 1984); *Wilkerson v. Amco Corp.*, 703 F2d 184, 185 (5th Cir. 1983). Thus, I do not believe that this Court should disturb a trial court's decision to prohibit juror interviews "for the purpose of obtaining evidence of improprieties in the deliberations unless specific evidence of misconduct was shown by testimony or affidavit." *Haeberle v. Texas Intl. Airlines*, supra. See also *United States v. Riley*, 544 F2d 237, 242 (5th Cir. 1976).

> Courts simply will not denigrate jury trials by afterwards ransacking the jurors in search of some ground, not previously supported by evidence, for a new trial.

*United States v. Riley*, supra at 242. The majority expresses concern that appellate counsel not be precluded "from exploring appropriate avenues of challenge." In my opinion, however, the majority is requiring the trial court to permit appellate counsel to launch "a 'fishing

expedition' in the hope of impeaching the verdict." *Big John, B.V. v. Indian Head Grain Co.*, 718 F2d 143, 150 (5th Cir. 1983). Therefore, I respectfully dissent to the majority's implicit vacation of the death sentence and the remand of the case for further proceedings in the trial court.

DECIDED DECEMBER 3, 1997 —<br>
RECONSIDERATIONS DENIED DECEMBER 19, 1997.

*Carlton C. Carter, J. Michael Treadaway, Ray Gary, Jr., Tanya Greene,* for appellant.

*Thomas J. Charron, District Attorney, Debra H. Bernes, Nancy I. Jordan, Jack E. Mallard, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Paige R. Whitaker, Wesley S. Horney, Assistant Attorneys General,* for appellee.