## A01A0282. BECK v. THE STATE.
### (551 SE2d 68)

ANDREWS, Presiding Judge.

Michael Beck appeals from the judgment entered after a jury found him guilty of two counts of aggravated child molestation and one count of aggravated sexual battery. The jury also found him guilty of two counts of aggravated sodomy, but the trial court granted Beck's motion for new trial on these counts in light of the Supreme Court's holding in *Brewer v. State*, 271 Ga. 605 (523 SE2d 18) (1999).[1] On appeal, Beck argues the trial court made numerous evidentiary errors and also that his trial counsel was ineffective. For the reasons which follow, we find no reversible error and affirm.

The evidence at trial, taken in the light most favorable to the verdict, was as follows. An investigator from the Douglas County Sheriff's Office testified that Kayla Beck, Michael Beck's estranged wife, brought her two children, A. A. and M. L. B.,[2] to the sheriff's office because of suspected child abuse. The children were in therapy at the time, and the investigator suggested that she continue with the therapy "and see what came out of it."

A few months later, relatives told the investigator that another family member, C. B., Beck's nephew, had also been sexually abused. The investigator sent the nephew, who was 11 years old at the time of trial, to meet with a counselor at Scottish Rite Hospital. After interviewing the children and after receiving reports from the counselors who interviewed the children, the investigator arrested Beck and charged him with sexually abusing his son, his stepson, and his nephew.

The mother of one of C. B.'s cousins testified at trial that the family learned that C. B. had been abused when they caught him engaging in inappropriate behavior with his younger cousin. When the family questioned him, he started crying and named "Uncle Mike" as having abused him and stated that he had been "doing it to me for a long time."

C. B.'s mother testified that he was a happy child until about the time he started kindergarten. At that time, he began getting into fights and misbehaving. His disposition changed, and he appeared sad much of the time. He was no longer able to control his bowels. After she discovered that Beck had been molesting him, she asked her son why he had not told her, and he said, "because Uncle Mike

---

[1] In *Brewer*, the court overruled those cases which held that the element of force necessary to prove aggravated sodomy would be presumed when the victim was underage and held that the State must still prove force, even if the victim is underage. Id. at 606-607.

[2] A. A. was Michael Beck's stepson and was five years old at the time of trial. M. L. B. was Beck's son and was four years old at the time of trial.

threatened to kill me."

C. B. testified at trial and described several instances in which Beck had anally sodomized him. The pediatrician who treated C. B. testified that the boy had a red scar in his anus that was the result of trauma. Also, the pediatrician said that C. B. suffered from attention deficit disorder, encopresis (which is a loss of sensation in the anus resulting in accidentally passing stools), and chronic constipation which was consistent with abused children in cases of anal sodomy. The psychologist, who was still treating C. B. for his emotional and behavioral problems at the time of trial, testified that C. B. had described to him several instances when Beck had anally sodomized him.

Kayla Beck said she became concerned for her children after she separated from Beck and noticed that A. A. had begun acting very angry and upset. She asked A. A. at one point if anyone had ever touched him, and A. A. said he did not want to talk about it "because he said he would whip me." After this conversation, Kayla Beck took A. A. and M. L. B. to a therapist, Bess Estis. Estis testified and said that she was a social worker who specialized in children that have been sexually or physically abused. She stated that the American Professional Society on Abuse of Children provides certain guidelines for therapists when interviewing children who are victims of abuse. Among others, the guidelines recommend using anatomical dolls, puppets, and drawing materials when interviewing victims of suspected abuse.

Estis said that A. A. was having difficulty talking about the sexual encounters, but he did tell her that C. B. had initiated some sexual touching with him and M. L. B. At that point, Estis used anatomical dolls in order to make it easier for A. A. to explain what had happened. A. A. said one of the dolls was C. B. and one was A. A. Then A. A. took the dolls' clothes off and put one doll's mouth on the other doll's penis.

When asked whether a grownup had ever touched him in that way, A. A. answered yes and elected to describe it by using a youth doll and an adult doll. He demonstrated both oral and anal sodomy. When asked whom the dolls represented, he said the boy was himself and the man was Daddy. A. A. said Daddy would whip him if he did not put his mouth on Daddy's "snake," a word he consistently used for penis.

At that time, Estis decided she should also see M. L. B. At the first session, M. L. B. described the same behavior using the dolls and said one doll was him and one doll was Daddy. When asked, "what did Daddy say about this," M. L. B. replied, "Daddy will whip me." Estis also described the children's behavior when talking about these occurrences as being consistent with that of an abused child.

Estis's testimony was extensive and involved many descriptions by both children of sexual abuse. Both children always identified "Daddy," meaning Beck, as the abuser.

The clinical social worker who first interviewed all three children at Scottish Rite Children's Center testified about proper interviewing techniques when dealing with small children and suspected abuse. She said that using anatomical dolls was an accepted practice in the process of interviewing small children.

A. A. and M. L. B. were examined physically, and the doctor found no physical evidence of abuse. The doctor also stated, however, that in 80 percent of child molestation cases there were no physical signs of abuse.

The State called Beck's niece as a similar transaction witness, and she testified to two instances in which Beck had fondled her.

In his defense, Beck called a psychologist, Dr. Herendeen, to testify about appropriate interviewing techniques with children. The psychologist described how suggestive children can be and said that using anatomical dolls was not generally accepted and, in fact, was discouraged. He stated that little boys who have been the victims of abuse can become abusers and also that a child might name one person as the abuser when, in fact, it was another person entirely.

Beck testified in his own defense. He said that he loved his sons and never molested them in any way. Also, he said he had tried to be a big brother to C. B. and to help when he was having problems. He denied ever molesting C. B. Beck also stated that after he and his wife separated, she got angry and told him that if he made trouble for her she would make sure he never saw the kids again.

1. The above evidence was sufficient to support the verdict. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. In his first enumeration of error, Beck claims the court erred in allowing into evidence his adult entertainment cable bills. Beck claims this evidence was inadmissible under *Simpson v. State*, 271 Ga. 772 (523 SE2d 320) (1999), which was decided while Beck's case remained pending. In *Simpson*, the Supreme Court held that evidence of sexual paraphernalia was "inadmissible unless it shows defendant's lustful disposition toward the sexual activity with which he is charged or his bent of mind to engage in that activity." Id. at 774 (1). Beck claims that evidence he watched the Spice Channel was inadmissible because it portrayed only adult sex and had nothing to do with the charges against him for molesting children.

At the hearing on Beck's motion for new trial, the court found that the evidence was admissible because it corroborated the testimony of one of the victims. C. B. testified at trial that Beck had shown him "strip movies and stuff," and "sexual stuff — that kind of movie."

This case is controlled by *Jowers v. State*, 245 Ga. App. 773 (538 SE2d 853) (2000). In *Jowers*, we held that evidence that defendant showed pornographic materials to the victims was admissible because the victims testified that defendant showed them the pornographic materials, "thus 'linking' them to Jowers's offense." Id. at 774 (2).

*Frazier v. State*, 241 Ga. App. 125 (524 SE2d 768) (1999), relied on by Beck, is not on point. In *Frazier*, the court specifically pointed out that none of the pornographic material was linked to the crime charged, "for example, by being shown to the child victim." Id. at 126 (1).

3. Next, Beck argues that his wife's testimony about his favorite sexual position was also inadmissible under *Simpson*. The prosecutor asked Kayla Beck what Beck's preferred sexual position was, and she replied, "Him on top, doggie style." The prosecutor also asked if she and Beck ever engaged in oral sex, and she replied, "No." When asked why not, Kayla stated, "I didn't go for that." Although this evidence was irrelevant, it was not harmful. A defendant's preferred sexual position with his wife, without more, is not necessarily evidence designed to show a "lustful disposition." As to the second comment, even assuming it was slightly prejudicial, its admission does not rise to the level of harmful error.

The cases relied on by Beck in support of this enumeration are not on point because they involve evidence such as pornographic videotapes, adult magazines, a videotape on bestiality, and other similar materials. For instance, in *White v. State*, 211 Ga. App. 694 (440 SE2d 68) (1994), the defendant was convicted of rape, child molestation, and aggravated sodomy. Id. Defendant's wife testified that he "engaged in anal intercourse." Id. at 696 (3). In light of the charges against him, this Court found the admission of this testimony was harmful error. Id. at 697.

That is not the case here. The error is harmless.

4. In his next enumeration, Beck argues the trial court erred in not allowing his expert witness to critique the State's interviews with the young victims. The court limited Beck's witness to hypotheticals because it found the State had been prejudiced by Beck's failure to provide the State with a summary of the psychologist's testimony or an opportunity to interview the expert as to what his testimony would be at trial.

The prosecutor objected to Dr. Herendeen's testimony at trial. He stated that Herendeen's name had been given to him just before the discovery deadline. When he called to interview Herendeen about his testimony at trial, Herendeen replied that he was unable to discuss it because defense counsel had not given him the videotapes of the interviews or any other materials. The prosecutor argued that

defense counsel delayed giving her expert any of the materials in order to "get around" the discovery rules.

Defense counsel argued below and on appeal that because Dr. Herendeen was not conducting any examinations, tests, or experiments, he was not required to make a written report and, therefore, she had nothing to give to the State prior to trial.

The trial court based its order on OCGA § 17-16-4 (b) (2) which provides:

> The defendant shall within ten days of timely compliance by the prosecuting attorney but no later than five days prior to trial, or as otherwise ordered by the court, permit the prosecuting attorney at a time agreed to by the parties or as ordered by the court to inspect and copy or photograph a report of any physical or mental examinations and of scientific tests or experiments, including a summary of the basis for the expert opinion rendered in the report, or copies thereof, if the defendant intends to introduce in evidence in the defense's case-in-chief or rebuttal the results of the physical or mental examination or scientific test or experiment.

OCGA § 17-16-6 provides that when the defendant has failed to comply with the reciprocal discovery requirements of this article, the trial court may, upon a showing of prejudice and bad faith, prohibit the defendant from introducing the evidence not disclosed or presenting the witness not disclosed.

Here, defense counsel provided the State with the name of the expert witness but, as of the time of the discovery deadline, had not provided the expert with any materials to review. Defense counsel did not give the court an explanation as to why she waited to give her expert the materials to review. The prosecutor pointed out that he had been prejudiced because his experts had already testified without any knowledge of what the defense expert would say. Accordingly, the trial court held that it would allow the expert to testify but he could not give opinion testimony on the interview techniques used in the case.

In *Rower v. State*, 264 Ga. 323 (443 SE2d 839) (1994), the court held "that the state may discover any written reports of experts that the defendant intends to introduce at trial. The defendant is not required to have the opinions of his experts reduced to writing nor is he required to produce any report that he will not offer at trial." *Sears v. State*, 268 Ga. 759, 761 (2) (493 SE2d 180) (1997). Also, the Supreme Court has held that "an interview of the witness is the remedy for failure to comply with the requirement that a witness must

be identified prior to trial; this remedy avoids the harsh sanction provided in OCGA § 17-16-6 of excluding evidence not properly disclosed." *Massey v. State*, 272 Ga. 50, 51-52 (4) (525 SE2d 694) (2000). See also *Romero v. State*, 247 Ga. App. 724 (545 SE2d 103) (2001) (trial court properly allowed defense counsel opportunity to interview State's expert before he testified and also offered opportunity to have defendant's expert return to court).

In light of the Supreme Court's holding in *Rower*, supra, we conclude the trial court erred in holding that defense counsel was required to provide a summary of the expert's opinion to the State, and a better solution would have been to allow the prosecutor to interview the witness before he testified. *Massey*, supra.

But, the trial court did not exclude the witness's testimony in its entirety, only limited it. And, a review of the expert's testimony shows Beck was not harmed as a result of this ruling. Trial counsel testified at the motion for new trial that she anticipated that Dr. Herendeen would assist her in cross-examining some of the witnesses and "teach the jury about leading techniques in cross-examining — or in examining children — interviewing children." The trial court allowed Dr. Herendeen to do this. Defense counsel was able to question the psychologist on the interview techniques used on the children. Counsel also used hypotheticals which were "strikingly similar" to what the victims claimed had occurred. Defense counsel extensively cross-examined the State's witnesses on their interviewing techniques. She was then able to examine her expert as to his views on those techniques and then use Dr. Herendeen's testimony during closing argument and apply it to the techniques used with the child witnesses.

Moreover, a review of Dr. Herendeen's testimony shows that defense counsel did question Herendeen on the suggestive nature of the questions asked of the children. For instance, she questioned him on the use of anatomical dolls and discussed the words "private" and "good touch/bad touch" as used by the child and the interviewers. At one point, the expert even directly mentioned the testimony of one of the State's experts by name and gave reasons why he disagreed with that testimony. Accordingly, the effect of defense counsel's questions was that Herendeen did, in fact, give his opinions on the specific interview techniques used on the children and also commented on possible reasons why the children would name Beck as their molester even though he had committed none of the acts described.

Because the trial court's restriction on the witness's testimony was minimal and the jury heard his extensive testimony on proper interviewing techniques and also heard his opinion as to why the interview techniques used by the State's experts were flawed, we find the error was harmless. In light of the other evidence at trial, there is

a high probability that the exclusion of evidence, if any, did not contribute to the verdict. See *Johnson v. State*, 238 Ga. 59 (230 SE2d 869) (1976).

5. Next, Beck contends the court erred in denying his motion for directed verdict after the State rested. At the time the State rested its case, only one of the child victims had testified. Defense counsel moved to strike statements made under the Child Hearsay Statute, OCGA § 24-3-16, and moved for a directed verdict because the children were not made available to testify.

But, the record shows that the children were present and available and defense counsel was aware of this. For example, during a discussion on how much longer the trial testimony would take, the court asked, "[W]hat about the kids?" The prosecutor replied, "As I said, Your Honor, they're here and they're available. They've been here for the last two days in case we got through Bess. I expect that they'll be available to testify once Bess is finished, you know, if defense counsel requests that they be placed on the stand. I assume they'd be your witnesses." The court asked whether the prosecutor planned to call the children, and he replied, "No, Your Honor."

*Sosebee v. State*, 257 Ga. 298 (357 SE2d 562) (1987), requires that "[b]efore the state rests, the court shall, at the request of either party, cause the alleged victim to take the stand. The court shall then inform the jury that it is the court who has called the child as a witness, and that both parties have the opportunity to examine the child." Id. at 299.

Here, the trial court corrected its omission by reopening the State's case and calling the witnesses as required. Defense counsel then questioned both victims.

Beyond stating that "his procedural rights were not observed and protected," Beck can show no harm from this claimed error, and, indeed, there is none.

6. Beck also claims the trial court erred in not allowing him to introduce evidence that he was acquitted of molesting his niece, a similar transaction witness. Beck claims he should have been allowed to cross-examine his wife and niece, who both testified about the molestation, in order to show that he was acquitted in that case.

Beck does not argue that the trial court erred in ruling that evidence of acquittal in a prior case could not be used to impeach the witnesses, but rather that the cross-examination should have been allowed for purposes of showing bias or motive. Beck cites to *Letlow v. State*, 222 Ga. App. 339 (474 SE2d 211) (1996), as authority for his argument that the acquittal was admissible. In *Letlow*, this Court held that "a prior act of molestation committed against the child of a witness is relevant to show any possible bias against an accused child molester that the witness may entertain, unconsciously or

deliberately" and the trial court erred in restricting the cross-examination of the witness on this issue. Id. at 342-343 (2).

The trial court was not persuaded and ruled that Beck could not introduce evidence of a prior acquittal, relying on *Jones v. State*, 159 Ga. App. 634 (284 SE2d 651) (1981). In *Jones*, however, this Court ruled that evidence that defendant was acquitted in a prior case was admissible when the State introduced evidence of the prior case through a similar transaction witness. Id. at 636-637. The court held that appellant's contention that the acquittal was admissible and relevant *in other ways,* in addition to the similar transaction evidence, was meritless. Id. at 636.

But, Beck did not argue below and does not argue on appeal that the evidence was admissible under *Jones* or that the trial court misconstrued that case. Beck's sole argument below and on appeal is that the evidence of acquittal in the former trial was admissible to show bias or prejudice on the part of two witnesses, his wife and niece. Under the authority of *Jones*, supra, the evidence was not admissible for those reasons. Id. at 636-637.

In addition, Beck has not shown how the trial court's ruling on this issue in any way prevented him from showing any bias or prejudice on the part of either witness. Defense counsel was never prohibited from cross-examining the witnesses about the state of their feelings toward Beck and his relationship to them. *Letlow*, supra at 342.

7. Likewise, the trial court properly excluded testimony that Paul Thompson was convicted of molesting Beck's niece. The trial court ruled that defense counsel could not use this evidence to impeach Beck's niece, the similar transaction witness, because it was inadmissible under the rape shield statute. Beck claims that fundamental fairness required that he be allowed to introduce evidence that a convicted child molester was the adoptive father of and lived in the house with one of Beck's victims.

In *Sales v. State*, 199 Ga. App. 791 (406 SE2d 131) (1991), we held that the trial court properly excluded evidence that the victim and her mother lived for a period of time with an uncle who had been charged with child molestation. The evidence was properly excluded because "there was no evidence that the victim had been molested by anyone else, and appellant does not suggest that he could have proffered evidence that the victim was molested by the uncle." Id. at 792 (2). Accord *Bell v. State*, 235 Ga. App. 825, 826 (510 SE2d 589) (1998). Likewise in the instant case, Beck points to no evidence that the victims were molested by anyone else. Accordingly, there was no error.

8. Beck also enumerates two instances in which he contends trial counsel was ineffective. In analyzing a claim of ineffective assistance of counsel, we note at the outset that a trial court's finding that a defendant has not been denied effective assistance of trial counsel

will be affirmed unless clearly erroneous. *Warren v. State*, 197 Ga. App. 23, 24 (1) (397 SE2d 484) (1990). The issue of ineffective assistance is a mixed question of law and fact. Under this standard, we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts. *Suggs v. State*, 272 Ga. 85, 88 (526 SE2d 347) (2000).

Here, Beck must overcome the strong presumption that defense counsel's conduct falls within the broad range of reasonable professional conduct. *Snyder v. State*, 201 Ga. App. 66, 69-70 (8) (410 SE2d 173) (1991). "There is a strong presumption that trial counsel's performance falls within the wide range of reasonable professional assistance, and that any challenged action by trial counsel might be considered sound trial strategy." *Datz v. State*, 210 Ga. App. 517, 518 (3) (436 SE2d 506) (1993). "To establish ineffective assistance of counsel, [a defendant] must show that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U. S. 668, 687 (104 SC 2052, 80 LE2d 674) (1984)." *Gross v. State*, 262 Ga. 232, 233-234 (1) (416 SE2d 284) (1992). The test is whether there is a reasonable probability the jury would have reached a different verdict, absent the error of counsel. Id.

Beck first argues that trial counsel's performance was deficient for failing to provide the State with a summary of his expert witness's testimony in order to circumvent the discovery statute. He claims the expert's testimony was limited as a result of counsel's failure to comply with the discovery statute.

Beck cites *Johnson v. State*, 266 Ga. 380 (467 SE2d 542) (1996), as authority for his claim that counsel's failure to comply with discovery requirements prejudiced his defense. In *Johnson*, defense counsel was unaware of the circumstances under which prior acts of violence by a victim were admissible. As a result, counsel failed to comply with Uniform Superior Court Rules 31.1 and 31.6. Id. at 381. The Supreme Court held that this legal error was indefensible and counsel was clearly unprepared to defend his client. Id. at 383.

Here, Beck does not claim that trial counsel was unaware of the discovery requirements or that her decision as to what was required in order to comply with OCGA § 17-16-4 fell below the broad range of professional conduct. He argues instead that she was ineffective because she "did not interpret the discovery statute in accordance with the trial court's understanding of the law."

In light of our holding in Division 4, supra, we find no merit to this enumeration. Trial counsel testified at the motion for new trial that she believed she was acting within the requirements of the discovery statute and never made any bad faith effort to circumvent it. Moreover, Beck can show no harm as a result of counsel's actions

such that there is a reasonable probability the jury would have reached a different verdict. *Gross*, supra. Dr. Herendeen's testimony was only slightly curtailed, and counsel was able to question him extensively on the interviewer's techniques.

Accordingly, although counsel's performance may have been deficient for failing to make a good faith effort to comply with the discovery requirements, Beck cannot show that if she had complied with the discovery requirements, there was a reasonable probability the jury would have reached a different verdict.

Beck also claims trial counsel was ineffective for failing to object to his wife's testimony about their sexual relations. Because we concluded in Division 3, supra, that the admission of this testimony was harmless error, Beck cannot show that a reasonable probability exists that, but for this evidence, the result of the trial would have been different. *Gross*, supra.

*Judgment affirmed. Eldridge and Miller, JJ., concur.*

DECIDED JUNE 25, 2001 —
RECONSIDERATION DISMISSED JULY 19, 2001.

*Jill L. Anderson, Mary Erickson*, for appellant.

Michael O. Beck, *pro se*.

*David McDade, District Attorney, James E. Barker, Assistant District Attorney*, for appellee.

